IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LESLIE ROSENTHAL, )
)
    Plaintiff, )
)
)
) No. 01 C 8528
    v. )
) Judge John A. Nordberg
BATTERY PARTNERS VI, L.L.C., )
a Delaware limited liability company; and )
BLACKSTONE GROUP, L.P., a Delaware )
limited partnership, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

In the spring of 2000, plaintiff Leslie Rosenthal and his friend, Richard Sandor, helped

arrange a meeting between Battery Partners, a venture capital firm, and the London International

Financial Futures Exchange ("LIFFE"). This meeting led to a tentative agreement in May in

which Battery and the Blackstone Group would jointly invest approximately $91 million,

receiving LIFFE shares in return. Shortly thereafter, Sandor and Rosenthal approached Battery to

negotiate a fee for their role in the transaction. In a phone conversation, Scott Tobin of Battery

promised both men that they would each receive $4.75 million in LIFFE shares when the

transaction closed. In the fall, when the transaction closed, Sandor received his shares.

Rosenthal did not.

The reason is that LIFFE became extremely upset over the summer when it discovered

that Rosenthal's company had been purchasing LIFFE shares on the open market in June and

early July. Because Rosenthal was an insider, these purchases potentially violated a rule of the London Takeover Panel and placed the entire transaction in jeopardy. LIFFE insisted that Rosenthal be cut out of the deal. Even after the potential problem with the Takeover Panel was resolved, LIFFE continued to insist that Rosenthal be kept out of the deal. Although Tobin tried to find some indirect way to keep Rosenthal in the deal, his attempts failed and he then made a few comments to Rosenthal's attorney and to Sandor to the effect that he was going to try to find an alternative way to compensate Rosenthal later. This lawsuit is about whether defendants are obligated to follow through on their initial promise to pay Rosenthal $4.75 million in LIFFE shares or whether they must compensate him in some alternative way. Both defendants have filed motions for summary judgment.

## FACTUAL BACKGROUND

In 1999, Battery became interested in investing in the financial futures industry.[1]  (B 12.)[2] Up until that point, Battery had invested mostly in communications, software, and e-commerce markets. (B 1.) Battery created a team to investigate this new area, which consisted of Oliver Curme, Michael Brown, and Scott Tobin. (B 13-14.) As part of the investigation, Tobin called Gerald Fishman, a Chicago attorney who practiced law in the futures industry and also happened to be Tobin's brother's father-in-law. (B 18.) Fishman referred Tobin to Rosenthal because he

---

[1] Battery Partners is a collection of venture capital funds. (B 1.) The specific defendant in this case is Battery Partners VI, L.L.C. Because these distinctions do not matter for purposes of this decision, we will use the more general label "Battery."

[2] References to the parties statements of facts will be to (B __) for Battery; to (BL __) for Blackstone; and to (R __) for plaintiff Rosenthal. Unless otherwise noted, all facts set forth herein are undisputed.

had extensive experience in the Chicago financial futures industry. (B 19; R 1.)[3] Rosenthal introduced Tobin to a long-time friend, Richard Sandor, who like Rosenthal was highly experienced and has been referred to as the "father" of financial futures for developing one of the first financial futures products. (B 9, 22.) Rosenthal and Sandor served as informal advisors and advised Tobin about industry trends and explained who the important people were in the industry. (R 4-5.)

Battery initially focused on the United States. It first tried to invest in the Chicago Mercantile Exchange, but no agreement was reached. (R 6-7.) Sandor and Rosenthal helped with a presentation made to the Exchange, providing market information and strategic planning. According to Tobin, if this investment had been successful, Rosenthal's presence would have increased the value of the investment with the local Chicago community. (R 10.)

Battery next tried to invest in the Chicago Board of Trade. (R 11.) Sandor and Rosenthal again provided advice. Sandor explained potential new products that could be introduced, while Rosenthal counseled Tobin on personalities on the Board of Trade. (R 12.) During a presentation, someone at the Board asked whether Sandor and Rosenthal had a financial interest in the transaction, and Battery said that they did. (R 13-14.)[4] No agreement was reached.

---

[3]Rosenthal is co-managing partner of the Rosenthal Collins Group, LLC ("RCG"), a financial services firm employing 500 people with $40 million annual revenues. (R 1; B 4, 19.) He previously served as a board member for Chicago Mercantile Exchange for four years and as a board member for the Chicago Board of Trade Clearing Corporation. (B 7-8.)

[4]Around this time, Battery formed limited liability company called Burberry-Hicks that was created to provide Rosenthal and Sandor with an equity participation in any completed transaction. (R 15.)

After these failed attempts, Battery focused on LIFFE. (R 16.) At the time, Sir Brian Williamson, who was the Chairman of the Board of LIFFE, happened to make a "courtesy visit" to Rosenthal at his Chicago office. (R 17.) Rosenthal told Williamson that Battery might be willing to invest in LIFFE. (*Id.*) Williamson was interested because LIFFE was then looking for investor to form a strategic partnership. (B Ex. 56; ¶ 4.). After the meeting, Rosenthal called Battery and Sandor. Rosenthal felt that it would be better if Sandor made the initial contact with LIFFE because he was friendlier with Williamson than was Rosenthal and could therefore add "further weight" to the negotiations. (R 17-18.) Sandor made the call and vouched for Battery by saying that they were "capable and elegant folks." (R 18.) Battery and LIFFE, without Rosenthal or Sandor being involved, worked out a tentative agreement and signed a term sheet outlining the key terms of the deal on May 22, 2000. (B 27; Ex. 9.) The deal later closed in November, 2000.

After it became clear that Battery and LIFFE had reached an initial deal, Sandor approached Battery to negotiate a fee on his and Rosenthal's behalf. Sandor first talked to Oliver Curme who suggested a figure in the vicinity of $2 million. Sandor rejected this offer, saying that he was "not amused" and thought that "this was very, very different from Burberry Hicks." (R 23.) Sandor clearly believed that he had some negotiating leverage and could demand a much higher figure.

Sandor next called Tobin and in fact did negotiate a much higher fee. During the conversation, Sandor brought Rosenthal in to get his agreement.[5] Because this conversation is important and because Sandor's description is undisputed, we quote it at length:

[5]Sandor stated that there may have been more than one conversation on the subject.

-4-

I had indicated [to Tobin] that I'd hoped he would come back with something that reflected the value proposition that we had brought to the table and something that was more in line with the spirit of the Burberry Hicks ownership and the spirit of what had been told to us verbally about the size of what our potential contribution would be.

The conversation then came down to the point where we had to either agree to come to a final number or agree to disagree. Scott indicated to me that he would, you know, go to $9 million. I said to him, well, Les and I were parties to that 9 million; that is, we would each get 4 and a half million; and I really didn't have the authority to act on Les' behalf, but we had to do that together.

So I conferenced Les in. I – and Scott said at that time. Well, we can – we can make it $9 million, you know, if – if you would go along with that number, that would be fine; and he said – and there was hesitancy. Nobody responded on our side.

So he said, Look. If you really press me, I guess I can go to 9 and a half; but I would rather stay at 9, and Les said, Let's do it at 9 and a half. Thanks, and we have a deal.

(R 23.) Tobin said "fine" in response to the assertion that they had a deal. (*Id.*)

Although not discussed in the May conversation, everyone understood that Sandor and Rosenthal would play an ongoing role in the investment, even after the transaction closed. (BL 31.) Tobin explained: "We had obvious interest in having Richard and Les as part of the investment group into LIFFE given the value going forward that Les would provide through the local Chicago trading community and the kind of structural and strategic work that Richard would do on behalf of the Exchange." (R. Ex. 1 at 41.) Rosenthal agreed with this assessment and explained that he would have been able to provide an entree to European exchanges because, without some type of introduction, Battery "couldn't get in the door." (B 33.)

After the deal was announced to the public on June 8th, Rosenthal's company, RCG, began buying LIFFE shares in the open market. It already owned 22,000 shares that it had

acquired since 1997. (R 35-37) The new purchases were made at Rosenthal's direction, which was the only time between 1970 and April 2005 that he had ever directed RCG to purchase specific shares. (B 68-69.)[6] From early June until July 6th, RCG purchased 44,275 shares on the open market. (B Ex. 18.)

Rosenthal did not tell anyone else in the LIFFE transaction about his company's open-market purchases. (B 71.) During the due diligence process, however, LIFFE discovered what Rosenthal was doing. (BL 49.) To put it mildly, LIFFE was unhappy when it found out. On July 9th, LIFFE called Tobin and informed him of the discovery. This was the first Tobin had heard of the purchases. In this call, which Tobin later described as "apocalyptic screaming" at him, Williamson said that Rosenthal's purchases were a "huge embarrassing blemish" on LIFFE and that "the whole deal had been thrown into question." (B 73.) This was because the purchases would trigger an inquiry by the London Takeover Panel given that Rosenthal was an insider and the purchases were made within 12 months of the close of the transaction. Therefore, if the parties did not get a whitewash waiver from the Panel, they would be required to purchase substantially more shares than they intended. This would have caused the deal to collapse. (B 83, 85.)

Williamson's anger was not limited solely to the potential problem with the Takeover Panel. As described in an affidavit by Roger Carlsson, another a LIFFE board member, Williamson was "incredibly upset" for three separate reasons:

_____

[6]Plaintiff disputes this fact but has not provided any evidence to support its position. It cites to Battery Exhibit 56, which is the affidavit of Roger Carlsson, but this exhibit does not contradict the fact or the evidence cited to support that fact. *See* B. Ex. 1 at 55-56 (Rosenthal deposition testimony).

- First, Williamson believed that the purchases put the entire proposed transaction in jeopardy because of the possible violation of British securities regulations.

- Second, Williamson believed that the purchases "obviously appeared unethical" and risked sullying LIFFE's reputation for honesty and integrity, which was highly valued by both Williamson and LIFFE.

- Third, because of Rosenthal's trading, LIFFE would have to take steps to try to salvage the transaction.

(B Ex. 56, ¶¶ 8-10.) For all these reasons, Williamson "wanted nothing to do with" Rosenthal and was "adamant" that he not be involved in the transaction "in any way." (Ex. 56, ¶ 11; B 73.) The Board agreed that any connection with Rosenthal had to be severed. (B 81.) LIFFE even stated that Sandor could no longer become a director as had been contemplated. (B 77.)

Later that afternoon after hearing how upset Williamson was, Tobin began calling people internally and at Blackstone to alert them about the problem. (B. Ex. 5 at 52-53.) He called Sandor and Fishman and told them of the gravity of the situation. (*Id.*)

The parties worked to fix the problem with the Takeover Panel. Deloitte & Touche, LIFFE's accountant, coordinated this effort. Both Rosenthal and Battery submitted explanations that were given to the Panel.

In a letter dated July 12th , Fishman explained that, although Rosenthal did have a "consultative relationship" with Battery and Blackstone, he did not have any material non-public information about LIFFE when his company made the open-market purchases and that he did not intend to violate any British rules.[7] (B Ex. 17.) At worst, Fishman argued, any violation was

---

[7]Defendants have suggested that Rosenthal in fact may have had some non-public information because he attended a strategy meeting with LIFFE officials on June 7th. (B 88.) But the evidence on this point is not clear and we must construe the evidence in plaintiff's favor on a motion for summary judgment.

inadvertent. Fishman closed by saying that Rosenthal was willing to take advice about selling his LIFFE shares because he did not want to "cause any issues in the [LIFFE] transaction." (*Id.*)

Battery submitted a memo dated July 14th in which it described its relationship with Rosenthal and Sandor over the last few years. (B Ex. 18.) At the conclusion of the memo, Battery stated that it was proposing to "terminate" its relationship with Rosenthal.

> Subject to the views of the U.K. Takeover Panel, Battery proposes to terminate the proposed participation of Mr. Rosenthal in the investor vehicle and undertake not to provide an introductory fee/compensation for his involvement in the LIFFE transaction to date. Accordingly, no agreement, arrangements or understandings exist between Battery and its concert parties and Mr. Rosenthal having any connection with or dependence upon the transaction with LIFFE.

(B 93.)

On August 17th, the Takeover Panel preliminarily indicated that it would allow the transaction to go forward subject to the following points: (1) Rosenthal was required to sell down the shares purchased since June 8th; (2) the Takeover Panel would consider Rosenthal to be a member of the Investor Concert Party whether or not he continued to participate in the investor vehicle and Rosenthal's continued involvement was a matter for the investors to consider with LIFFE; (3) Rosenthal's shareholdings and dealings would have to be disclosed in the prospectus; and (4) Rosenthal's pre-June 8, 2000 shares would be disenfranchised from voting on the whitewash resolution. (B 95.)

After receiving ruling, Brown emailed Tobin and described it as "good news" regarding Rosenthal's investment. (B 98.) Tobin responded that it was "terrific news." (B 99.) Even before the preliminary ruling, as early as August 1st, Tobin had been exploring possible alternative compensation arrangements. (R Ex. 1 at 66.) Tobin considered two main ideas. One

was to have Sandor hold Rosenthal's shares for him  (R 49.)  But this idea was rejected by Sandor who said his accountants and attorneys would not agree to the arrangement. Another idea was to compensate Rosenthal by giving him a percentage of Battery's proceeds when it eventually exited from the LIFFE investment. The plan was to put this agreement into writing in a side letter before the deal closed. However, this idea faded when LIFFE's accountants stated that it would "contradict" Battery's representation in its July 14th memo that it was terminating its relationship with Rosenthal and "could lead the Panel to revisit its preliminary ruling to continue to allow the whitewash." *See* R. Ex. 26. It does not appear that Battery ever told Rosenthal about this possible idea.

On September 12th, LIFFE's outside legal counsel set a conference call for the next day with representatives from everyone involved in the transaction. One of several items on the agenda was "Les Rosenthal." (B 102; B Ex. 26.) At the conference call, LIFFE told Battery that Rosenthal could not be included in the transaction. (B 103.)

Later that day, Brown relayed the news to Fishman, telling him that "Brian Williamson doesn't want to disclose Les." (B 105.) Fishman testified that he then called Rosenthal with the news. (B 105.) Rosenthal claims, however, that Fishman did not call him. (B 107.)

That same day, Fishman also heard from Miriam Thomas, an attorney for Blackstone, who told Fishman the same news. According to Fishman, but disputed by Blackstone, Thomas promised in this conversation that Battery would take of Rosenthal.

Two days later, on September 15th, Fishman sent an email to Sandor describing a conversation that Fishman allegedly had with Tobin the night before:

Rich -- Scott called me at home last night, as a result of my voicemail. He said that his first goal is to get the deal done as quickly as possible, but he said that they recognized their deal with you and Les, but still didn't know how to handle the Les situation. He said he was going to call Les today at his first opportunity and then he would call me. He obviously cares for both of you and wants to do right -- and would even be willing to "stretch" to get Les his due, but they haven't figured out how, yet. Apparently, Williamson refuses to disclose anything about Les in the prospectus, and this means to them that he can get nothing related to the transaction, even – apparently according to [Brian Williamson] -- after the deal is long over and Battery makes its distributions to its own partners.

(B 106; Ex. 30.)

Also on September 15, 2000, LIFFE's accountant faxed Fishman a written summary of the Takeover Panel's ruling. (B 108.) It stated, among other things, that Rosenthal's trading constituted an "inadvertent breach" and that he must sell his recently purchased shares to independent parties. (B 111.)

In compliance with this ruling, Rosenthal had his company sell the LIFFE shares acquired since June 9, 2000. (R Ex. 24.) These sales took place from September 18th until the 21st and Rosenthal's company realized a $25,000 loss.[8] (R 41.) After Rosenthal sold his shares on the open market, the Takeover Panel granted the whitewash waiver. (R 42.)

Sometime in September, Tobin attended a small dinner party at the home of Keith Bronstein. (R Ex. 6 at 40.) Rosenthal and Sandor were there along with their wives, as well as Burt Gutterman and his wife. (R Ex. 6 at 40; B Ex. 5 at 74.) One of the conversation topics was the LIFFE deal and the "fact that Les had been disenfranchised." (R. Ex. 6 at 40.) Tobin testified that it was a casual dinner party where they joked about the issue and that Rosenthal even gave

---

[8]Plaintiff in his brief gives the impression that he sold these shares "immediately" after the Takeover Panel's August 17th preliminary ruling. See Br. at 14-15. In fact, as noted above, the sales did not take place until about a month later. See R. Ex. 24.

him a box of chocolates "that had the words 'eat me' on the cover [] as a jocular reference to the fact that he was no longer part of the deal." (B. Ex. 5 at 74.) Sandor testified that, at one point during the party, Tobin came over and "reaffirmed the fact that [] Battery had an obligation and it would subsequently satisfy to -- to pay Les."[9] (R Ex. 6 at 40-41; R 51.) Rosenthal was apparently not around when this conversation took place.

On September 25, 2000, Rosenthal asked Fishman to call Tobin with "another proposal" about compensation.[10] (R 52.) The evidence regarding this proposal is sketchy and indirect. Neither Rosenthal nor Fishman could independently remember what the proposal was. (R. Ex. 5 at 370.) Fishman was shown his handwritten notes of a call to Rosenthal on the 25th and interpreted them as saying that Rosenthal was offering to "take [Tobin's] word on this deal, not [a] different deal" and that he was "willing to trust into [the] LIFFE deal (even a year)."[11] (R. Ex. 10 at 327; R Ex. 29; emphasis in original.) Based on these notes, Fishman believes that he "probably" conveyed the proposal to Tobin. (R Ex. 10 at 328, 330, 334.) Insofar as we know, no one at Battery ever responded to it.

In late October, the parties in the LIFFE transaction finalized the documents and the deal closed in November after LIFFE's shareholders voted to approve it. (BL 44.) Sandor entered

---

[9]On further questioning in his deposition, Sandor conceded that Tobin didn't use these exact words and that they were really Sandor's own "interpretation" of what Tobin said because Sandor couldn't remember the specific words. (B Ex. 4 at 384.)

[10]The phrase "another proposal" is the one plaintiff uses in his brief.

[11]Rosenthal in his deposition initially read these notes as saying "*over* a year," although he also thought it was possible they said "*even* a year." (R. Ex. 5 at 371.) In his brief, plaintiff for some reason uses the phrase "*up* to a year." (Br. at 17; *see also* R 52.)

into a lengthy warrant agreement and received 368,083 LIFFE shares. (R 58.) Those shares came 50/50 from Battery and Blackstone who had an equal number of shares after the deal closed.

Approximately a year later, Euronext, another futures exchange, announced that it was making an offer to buy LIFFE. At this time, LIFFE shares were around 3 and 1/2 times their value as of the closing the year before, meaning that Sandor's shares (and the shares Rosenthal would have received if he had been included in the deal) were now worth around 12.5 to 14 million dollars. The Euronext announcement prompted Fishman, on September 28, 2001, to email Tobin with another "idea" to consider:

> Scott - An Idea for your consideration. L[es] can't be a "concert part", but once a deal is struck and a buyout occurs, there should be no reason why he can't receive the same net that R[ichard] receives, as if you - all have been an "informal nominee," though he isn't part of the deal currently or officially. I'm sure you're aware that his prior inadvertency was not intended for his benefit and occurred only due to his lack of familiarity with the specific local Takeover Panel rules in the UK, as explained in his prior written submissions to the Panel. By getting him those net proceeds (equivalent to R's) everyone ends up where they should be.

(R 59.) Tobin responded that same day:

> It won't fly. Blackstone won't do it and [Battery] won't alone. I am sorry but I will try to figure out something on another deal. It may be the best I can do.

(*Id.*; R Ex. 36.)

About a month later, on October 31, 2001, Fishman again contacted Tobin about the issue. This call triggered a series of internal emails back and forth between Tobin and Curme.

Tobin's first email to Curme stated:

> I got a call from Jerry Fishman, attorney in Chicago who repped Rosenthal and Sandor. He was calling to find out if we were going to "take care" of Les now that the deal is done. I flat out told him that there was no taking care of Les, that he was out of the deal and that was the bottom line. I am passing it along and have asked Michael to check with legal on whether they can construe anything

that we may have done wrong although there has been nothing that I believe since the incident including Rosenthal purchasing the shares.

(R 60.) Later that evening, Tobin sent another email to Curme in which he further reflected on

the issue:

> I have been troubled by this this evening. I don't want any enemies and I don't want him to think we screwed him. But I feel like unless we give him what he believes to be his take he will feel like we dicked him. Now I am certain that we don't owe him but you know the type of guilt complex I have and I do feel bad about the circumstances. Certainly richard benefitted the most by les being out but I don't expect him to give out the generosity of his packet. Where does this leave me, I guess I feel I want to give him some shares in one of the upcoming deals and he'll just have to live with the fact that there is a _____ and that it may not pan out. The best would be a deal where we'll own a whole bunch, so maybe moremagic, ibext or imprivata. Though the return won't be what the life would have been had he not been disassociated from it[,] it is the best I think I could do. Do you think one or two points of equity is too much? Perhaps we give him a piece of two deals in that amt. Any thoughts?

(R 61.) The next morning, after Curme had expressed surprise that Tobin was even considering

the issue, Tobin stated:

> I may have been reacting to fishman. I try to be f[air] and moral in these situations and even though it was caused by his own stupidity I feel bad. You know do unto others what you would want them to do to you.
>
> Do you think [t]he percentages I suggested are ok, do I need to get partnership approval. I was thinking of two points in two deals of which he can choose from a list of three or should I just suggest two points in ibex, mms and imprivata if we do it.
>
> Your thoughts? It will be easier than doing a cash payment.

(R 61.) Later that morning, Tobin sent another email to Curme:

> Did you see my last email about:
>
> (1) Do you think those amts are the right level 1-2 points in three deals where we would own more than 50% (Ibex, MMS, Imprivata????)
> (2) Do I need partnership approval for this/
> (3) I think its better than a token $ amt which I don't see us anteing up for.

-13-

(R 61.) These internal musings were never translated into a concrete offer.

Perhaps this is because any further consideration was truncated when Rosenthal filed this lawsuit five days later. The complaint seeks $12 million in damages and alleges that Rosenthal "understood that he would either get shares and warrants in the LIFFE deal or Battery/Blackstone would put him in another deal to compensate him after the purchase of LIFFE was complete." (Cmplt. ¶ 19; B 182.)

## DISCUSSION

Plaintiff asserts two claims under Illinois law, one for breach of contract and one for promissory estoppel. The first claim rests on the May 2000 phone conversation between Tobin and Sandor; the latter claim is based on the statements made by Tobin and others that they would try to find some other way to compensate Rosenthal.

### I.    Breach of Contract.

We begin with the breach of contract claim as the parties devote most of their attention to it. Both sides believe that the central issue is whether an enforceable oral contract was formed in the May conversation. Defendants' position is that no contract was formed because the parties had not yet resolved many key terms and anticipated a later written agreement would be entered into. Plaintiff argues that any such agreement would merely flesh out non-essential technical details concerning the transfer of the shares and warrants. Each side cites to numerous cases that they believe are factually similar.

In considering plaintiff's assertion the parties intended to enter into a 9.75 million dollar binding agreement based on a relatively brief phone conversation, our first reaction is one of mild surprise. As the Seventh Circuit observed in *Trustmark Ins. Co. v. General & Cologne Life Re*

-14-

*Of Am.*, 424 F.3d 542, 544 (7th Cir. 2005): "Surely, if there is any moral to this story, it is to 'get it in writing.' It is astounding in this day and age to find it necessary to repeat this admonition, but no less so than to find a sophisticated party willing to leverage an agreement involving multiple years and million dollars solely on the enforceability of a simply handshake." Why did the parties here proceed so casually here? Plaintiff does not say, although the reason certainly cannot be that he did not know the risks of proceeding without a written agreement, as he has been described as "extraordinarily astute" and "very sophisticated." (B 10.)

Whatever the reason, we must put any initial skepticism aside because oral agreements are not unenforceable per se. As with written contracts, the key question is the parties' intent. Did Tobin and Sandor and Rosenthal intend to enter into a binding agreement in their May phone conversation? In answering this question, we first examine what the parties explicitly said (or did not say) in the May conversation and then broaden out to look at contextual evidence including the parties' history, earlier negotiations, subsequent statements, the nature of the transaction, and any customary business practices for this type of transaction.

The parties argue that this case falls within a more specific fact pattern in which a tentative agreement, either oral or written, is reached with the expectation that a more detailed one will follow. The Illinois Supreme Court has addressed this situation in two key cases -- *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 500 N.E.2d 1 (Ill. 1986) and *Quake Construction, Inc. v. American Airlines, Inc.*, 565 N.E.2d 990 (Ill. 1990). *Ceres* involved an oral agreement while *Quake* involved a letter of intent. In these cases, the Illinois Supreme Court set forth various factors to guide the analysis.

Before discussing those factors, one important preliminary point should be established. Defendants have suggested at various points in their brief that the May conversation cannot be a binding agreement because the parties anticipated a later written agreement. While the evidence is undisputed that the parties did have such an expectation, this fact is not determinative by itself but is just one of several factors to consider. As the Illinois Supreme Court stated in *Ceres*, "if the parties agree that a formal document will be prepared only as a memorialization of the oral agreement, the bargain is binding even though the document has not been executed." 500 N.E.2d at 5; *Dillard v. Starcon Int'l Inc.*, 483 F.3d 502, 508 (7th Cir. 2007) ("Continued negotiations *may* indicate a lack of agreement on material settlement terms, but not necessarily so.") (emphasis in original); *Magallanes Investment, Inc. v. Circuit Systems, Inc.*, 994 F.2d 1214, 1218 (7th Cir. 1993) ("If the parties intend a writing to be binding, references in that writing to a subsequent more formal agreement will not undo the parties' intent.").

One other preliminary point concerns the degree of detail. This factor is important for two reasons. The first is that a general inference exists that the more terms the parties agreed to, the more likely they intended to enter into a binding agreement. At the same time, as the Seventh Circuit has noted, "[t]he fact that a contract is incomplete, presents interpretive questions, bristles with unresolved contingencies, and in short has as many holes as a Swiss cheese does not make it unenforceable for indefiniteness." *Haslund v. Simon Property Group*, 378 F.3d 653, 655 (7th Cir. 2004). The second reason is that, intent aside, a court cannot enforce an agreement that lacks the essential terms because it would have no way to figure out how the parties would have filled in the missing terms. *Id.*; *Dillard*, 483 F.3d at 508 ("Terms addressing purely contingent matters are not necessarily material."). As the Seventh Circuit explained in

one opinion, there must be some "interpretive path" that can guide the court from the the terms the parties did agree on to the ones they did not. *Haslund*, 378 F.3d at 655.

With these two points in mind, we turn to the factors the Illinois Supreme set out in *Ceres*. They are: "whether the contract is one usually put into writing; whether there are a few or a great many details; whether the amount of money is large or small; whether the agreement requires a formal writing for the full expression of the convenants; and whether the negotiations themselves indicated that a written document was contemplated as their conclusion." 500 N.E.2d at 5. Later in *Quake*, the Court again recited these five factors and included a few more: "where [] the negotiating process [] is abandoned, the reasons it is abandoned, the extent of the assurances previously given by the party which now disclaims any contract, and the other party's reliance upon the anticipated completed transaction." 565 N.E.2d at 994.

Defendants argue that warrant agreements are always reduced to writing and that the agreements Sandor eventually entered into were complex and included detailed formulas. They also argue that the oral agreement lacked key terms, including what consideration Rosenthal was providing. They finally suggest that the dollar amount here is larger than those in the cases cited by the parties. Plaintiff argues that the the parties' relationship before the May conversation, including the creation of the Burberry Hicks investment vehicle and the comments made at the presentation to the Board of Trade, show that Battery intended to enter into a binding agreement.

Both sides present reasoned arguments supporting their position. In plaintiff's favor, the specific words used in the phone conversation strongly suggest the parties knew that they were doing something more than discussing proposals. According to Sandor's testimony, which is undisputed, the participants used unambiguous language. Tobin said: "Let's do it at 9 and a

half." Sandor said: "Thanks, and we have a deal." Tobin said: "Fine." In addition, the back and forth nature of the conversation, in which the parties first haggled about the amount and then each person affirmatively indicated his approval of the final amount, suggests that parties knew that they were entering into a deal. No one made any qualifying statement that the deal was contingent on further negotiations.

As for the lack of detail, plaintiff argues, and a jury could reasonably believe, that these terms are non-essential. For example, the Seventh Circuit has stated that an agreement to provide an employee one percent in equity was not indefinite simply because the parties had not agreed on details such as whether the stock would be voting or nonvoting and whether there would be restrictions on vesting, even though such issues were in some sense "important." *Haslund*, 378 F.3d at 655-56. Most of the missing terms identified by defendants concern matters that might be technical and complex on some mathematical level, such as the formula for converting dollars to pounds, but are arguably not important in the larger scheme of the agreement.

There is one missing term that is potentially more significant. This is the issue of consideration. Why was Rosenthal being paid $4.75 million? Plaintiff does not give a consistent answer. In some places in his brief, he argues that this was a finder's fee agreement where he was being paid merely for "serving up the deal." If so, then this would seem to be a handsome payout for essentially making a few phone calls. To be fair, Rosenthal does claim that he spent "countless" hours advising Tobin in the two earlier failed attempts and in educating him generally about the industry. This theory also would mean that the consideration for the deal had already been performed before the May conversation took place. In other places, plaintiff

-18-

suggests that he was being paid for his future role in the enterprise including doing such things as providing an introduction to European exchanges. This theory is more consistent with the facts as it is undisputed that everyone expected and wanted the two men to be involved. This theory also makes the large payout seem more reasonable. But it suffers from a different problem of vagueness. The parties never discussed what duties the two men would have. How would a court know how to enforce this aspect of the agreement?

We see no need to further analyze this argument or the defendants' other arguments along this same line because they all suffer from a larger problem. This deal did not fall apart because the parties got bogged down in trying to negotiate conversion formulas and the like or even because there was some dispute over what role Rosenthal and Sandor would play in the company. We need not speculate about whether the parties would have been able to agree on these missing terms because, unlike most cases, we have the perfect control group. Sandor, who had the same agreement as plaintiff and was represented by the same attorney, did enter into a final agreement. There is no reason to think that the defendants would not have entered into the exact same agreement with Rosenthal. Sandor's agreement thus provides a clear "interpretative path" to the missing terms.

This deal instead broke down for a different, and unexpected, reason. Rosenthal began purchasing shares on the open market. It is not clear that the parties would have addressed this contingency even if they had sat down in May 2000 and entered into a more detailed agreement. In this sense, the focus on the May 2000 agreement is a red herring. We think that a better way to analyze what happened in this case is to assume that the initial agreement was binding but then ask whether defendants had an implied right to revoke that agreement. This framework is more

consistent with the way the parties have described what happened. In Battery's July 14th memo, it stated that it was proposing to "terminate" the agreement. The parties in their briefs state that Rosenthal was "cut out" of the deal. The people at the Bronstein dinner party joked about the fact that Rosenthal had been "disenfranchised" from the transaction. These phrases all imply that something existed that was later undone.

This framework also fits naturally with a long-recognized legal doctrine. As commentators have explained, courts have a right to impose an implied condition if it is "necessarily inherent in the actual performance of the contract." *Williston On Contracts*, 4th Ed., § 38:11. at p. 421. Such a condition may be imposed to "to promote justice and prevent injustice. *Id.*; *see also* Restatement of Contracts 2d, § 226. One example provided by *Williston* is that a promise to repair another person's house includes an implied promise that the promisor will be allowed access to the house. § 38.11 at p. 421.

Not only is this doctrine well-established, it is one that plaintiff initially raised. In his complaint, he alleged that the May oral agreement "contained a convenant, implied by law, pursuant to which the parties promised to deal with each other in good faith, and not to do anything that would deny the other the benefit of the fruits of the contract." (Cmplt. ¶ 31.) In his brief, he made a similar point when he stated that he was not arguing that defendants were obligated to provide the shares to him even "if the LIFFE transaction did not close." (Pl. Br. at 29.) However, the parties never explicitly agreed to this condition. Plaintiff therefore is arguing that it should be implied as a matter of law.

Under this same logic, we find that defendants had an implied right to revoke their (alleged) agreement with plaintiff because of his share purchases. The evidence is both clear and

undisputed that LIFFE was not willing to proceed with the transaction with plaintiff involved. It insisted that any connection to him be severed. All the witnesses agree on this point. Sandor acknowledged this fact, as did Fishman, and even plaintiff himself. Plaintiff confirms this point in his brief where he straightforwardly says that he was cut out of the deal at the insistence of LIFFE. (Br. at 3.) If LIFFE was not willing to go forward with the deal with plaintiff involved, then defendants had no choice but to cut him out of the deal -- otherwise there would be no shares to give to plaintiff. Plaintiff's actions threatened to ruin the very deal that he was supposedly being paid for serving up.

Plaintiff has no answer to this basic point. His main argument is to try to shift the focus and suggest that the only barrier was the Takeover Panel and once it issued a ruling allowing him to participate, everything was fine. But this argument ignores the undisputed fact that LIFFE still insisted that he not participate in the deal *even after* the Takeover Panel indicated he could. This argument also ignores the fact that LIFFE was upset by more than the potential problem with the Takeover Panel. As Carlsson noted, Williamson and the LIFFE board were also upset because they felt the purchases "appeared unethical" and sullied LIFFE's reputation, in addition to interjecting increased costs and anxiety into the deal. Moreover, even if Rosenthal had been allowed to receive shares, he likely would not have been allowed to be involved in the business as Battery had hoped he would. In sum, simply because the Takeover Panel problem was eliminated in the late stages of the process does not mean that LIFFE was no longer upset or that it was obligated to include him in the deal.

Plaintiff argues that Battery used the "non-issue" of the problem with the Takeover Panel as a "wedge" to cut him out of the deal. (Br. at 4.) The suggestion seems to be that Battery

-21-

seized upon a pretextual issue for financial gain. This theory has no support. First, as explained above, Rosenthal was cut out of the deal at the insistence of LIFFE and there is no evidence that Williamson was bluffing or that Tobin had leverage to force him to change his mind. Second, this theory runs counter to the undisputed evidence, which is that Tobin worked hard to find a way to keep Rosenthal in the deal and that he sincerely wanted him to be included.

Plaintiff's only other argument is to complain that he was misled into thinking that the only reason he was being cut out was because of the Takeover Panel. The factual support for this claim is extremely weak because, at a minimum, plaintiff's lawyer knew all along about that LIFFE did not want Rosenthal in the deal. Fishman was told about this fact on July 9th when the problem was first disclosed and was again told about it, by two different people, after the September 13th teleconference. Plaintiff's argument is that his lawyer for some reason simply didn't communicate these facts to him. In any event, plaintiff has not asserted any fraud-based claim and it is hard to see what his damages would be for the brief period during which he was allegedly unsure about the reason why he was being cut out of the deal.

## II. Promissory Estoppel.

Count II was originally labeled in the complaint as a claim for equitable estoppel but the parties now agree that it is instead a claim for promissory estoppel. Plaintiff claims that, beginning around the time when it first became known that he might be left out of the deal, defendants made various promises to the effect that they would figure out some other way to compensate him. (Cmplt. p. 7.)

To assert a claim for promissory estoppel, the plaintiff must show that the defendants made an unambiguous promise that plaintiff could and did reasonably rely on to his detriment.

-22-

*Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 702-05 (7th Cir. 2004). Relying on a number of cases, defendants argue that the alleged promises were merely aspirational statements or gestures of good will and that they cannot support a claim for promissory estoppel. *See, e.g., id.* at 703-05 (statements could not reasonably be considered promises but were instead "expressions of optimism and determination"); *Nibeel v. McDonald's Corp.*, 1998 WL 547286, at *11-12 (N.D. Ill. Aug. 27, 1998) (granting summary judgment: company's statement that "we're going to take care of you" was too vague because the company merely "expressed its hopes"). Defendants also argue that plaintiff did not rely to his detriment on any promise.

After reviewing the undisputed facts, we agree with defendants and find that the assortment of alleged promises are too scattered, vague, and inconsistent to constitute a binding promise. This conclusion is evidenced, first of all, by the fact that it is difficult to figure out which statements are at issue and how they fit together. Plaintiff relies on a shotgun approach in which he sets out -- in the fact section of his brief -- every email or snippet of conversation arguably relating to the issue. In a few instances, he artfully juxtaposes these facts to create a misleading impression. But in the legal analysis section of his brief, which is only two pages, he never analyzes any of the specific statements and only mentions one of them in passing.

Our first task then is to set forth in one place the statements upon which plaintiff appears to be relying. After reading plaintiff's briefs, we have identified the following statements, set forth roughly in chronological order:

- Battery asked Sandor if he would hold Rosenthal's shares for him.
- Battery considered a proposal in which it would promise, in a side letter to be entered into before the LIFFE transaction closed, to give Rosenthal a share of Battery's proceeds when it exited the investment.

- On September 13th, Miriam Thomas, a Blackstone attorney, told Fishman that Battery "would take care of" Rosenthal.

- On September 14th, Tobin called Fishman at his house and told him that Battery "recognized their deal with [Sandor] and [Rosenthal], but still didn't know how to handle the [Rosenthal] situation."

- At a September dinner party, Tobin told Sandor something to the effect that Battery reaffirmed that it had an obligation to Rosenthal that it would "subsequently satisfy."

- On September 25th, Fishman called Tobin with a proposal from Rosenthal. The proposal was that Rosenthal would take Tobin's word on the LIFFE deal, and not any other deal, and would trust him "up to a year."

- A year later, in the fall of 2001, Fishman emailed Tobin with an "idea." The idea was that Rosenthal would receive the same net as Sandor if a deal was struck with Euronext.

- In October 2001, Fishman called Tobin and asked if Battery was going to "take care" of Rosenthal. This query prompted Tobin to speculate about ways to compensate Rosenthal such as giving him "two points in two deals of which he can choose from a list of three."

As this list illustrates, the alleged promises come in a variety of forms, some of them made by different people, and cover a broad time frame, stretching from soon after the initial discovery of plaintiff's trading in LIFFE shares to more than a year after the deal was closed. They were generally made in casual contexts -- at a dinner party, in a phone conversation, or an email. Notably, none of the statements was made directly to plaintiff and all were thus filtered through the interpretive lens of another person. When Rosenthal was asked in his deposition about which promises he relied on, he stated that he was relying on a "theme" that was woven through "three or four or five different conversations" with several different people. (BL Ex. 1 at 129.) A theme by its very nature is vague.

The sheer number of statements, rather than providing confirmatory evidence, creates doubt. The successive nature of these communications, with statements going back and forth with no apparent connection to each other, undermines confidence in the reliability of any individual statement. For example, if plaintiff is claiming that he relied on the statement made to Sandor at the Bronstein dinner party, then why did he a week later have his attorney call up Tobin with "another" proposal? Why make a proposal if there was already a promise on the table? The same point arises when, a year later, Fishman emails Tobin with an "idea for your consideration." A promise is followed by a proposal which is even later followed by an idea to consider. Viewed from a broader perspective, these statements look more like failed negotiations.

This conclusion is reinforced by the fact that it was plaintiff's attorney who initiated several of these proposals and that Battery explicitly rejected (or did not respond to) them. When Fishman proposed the "idea for consideration," Tobin responded eight minutes later with an unequivocal rejection, saying "it won't fly." When Fishman called Tobin around October 31st, Tobin again gave a clear no, stating "flat out" that "there was no taking care of Les." As for the proposal for Sandor to hold Rosenthal's shares, it was rejected by Sandor. Battery did not respond to the September 25th proposal.

In his brief, plaintiff occasionally leaves out these details and creates the impression that the statements are more than they are. For example, plaintiff makes this assertion:

> After Sandor determined that he could not hold Rosenthal's shares, there was a proposal that Rosenthal would wait until Battery/Blackstone exited the LIFFE investment, and then Rosenthal would directly receive the then value of his shares and warrants. This proposal was to be set forth in a 'side letter.' That arrangement was acceptable and seemed to put the issue to rest as the LIFFE deal closed.

(Pl. Br. at 5.) While this summary may seem reasonable on the surface, it is misleading on closer analysis. Although it is true that Tobin considered this proposal, plaintiff leaves out the fact that LIFFE's accountant effectively said no. By using the passive voice phrase that the "arrangement was acceptable," plaintiff artfully glides around the fact that there no evidence that Rosenthal ever knew about the proposal, much less "accepted" it in some formal way. Plaintiff also does not answer the glaring question: where is the side letter?

Yet another problem with these statements is the question of authority. Plaintiff's apparent theory is that Tobin decided, on the spur of the moment at a cocktail party, to bind his company to pay $12 million. We know that, later in his November 1, 2001 internal email to Curme, when he was considering more specific proposals, Tobin was concerned that he might need partnership approval. Along a similar line, plaintiff claims to have relied on a statement made by a Blackstone attorney, Miriam Thomas, that Battery would take care of Rosenthal. No evidence suggests that Thomas had the authority to enter into a binding promise on behalf of her own client, Blackstone, much less to enter into a binding agreement on behalf of *Battery*.

As for the substance of the statements, plaintiff's claim again runs into numerous problems. The alleged promises are vague and thus it would be hard for a court or jury to tell if they had been fulfilled. What does it mean to "take care" of someone? Or to "subsequently satisfy" or "reaffirm" an "obligation"? In some instances, there is doubt as to what the specific words used were. In particular, take the September 25th proposal that Rosenthal asked Fishman to offer to Tobin -- namely, that Rosenthal would take Tobin's word for "*up* to a year." The only evidence that the proposal included this phrase is Fishman's notes. But Fishman thought his notes said "*even* a year" and Rosenthal initially thought the phrase was "*over* a year" and then

-26-

thought it could be *"even* a year." But no one, as far as we can tell, thought it said *"up* to a year," and it thus appears to be either a mistake or an interpretation by plaintiff's attorney. The uncertainty about this phrase is not trivial. None of the other statements included any time limitation in which the promise to "take care of" Rosenthal must be performed. Without this time limitation of a year, a question would arise whether plaintiff prematurely filed suit after only a year and did not give defendants time to comply with the alleged promise. It is not clear that a comparable deal had yet come up during this year. Of course, we should not forget in this discussion that the greatest problem with the September 25th proposal – it was never accepted by Battery.

We are not even confident about what the specific promise supposedly was. In his complaint (at p. 7), plaintiff alleged that he was promised a "deal of similar value in an amount and value equal to those received by Sandor." Where does this come from? None of the statements listed above include such a promise. Instead, they are more vague, such as the promise to "take care of" plaintiff, and thus do not include the qualification that plaintiff must receive similar value. Nor do they indicate that he must receive shares in a deal as opposed to cash. In fact, in his own September 25th proposal, plaintiff affirmatively stated that he did not want to be in another deal.

In sum, the substance, context, and overall pattern of these statements suggest that they were aspirational statements, not binding legal commitments upon which a reasonable person could rely. In reaching this conclusion, we recognize that Tobin did make statements suggesting that he wanted to, or hoped to, find some alternative way to compensate plaintiff. After all, he and Rosenthal had some type of friendship or at least a working relationship over time as

evidenced by the fact that they attended a small dinner party together and even joked about the problem. Tobin is also related by marriage to Rosenthal's attorney. (These facts are one reason why the question of Tobin's authority is not an insignificant point.) But the mere fact that Tobin may have wanted to help out a business friend or felt sorry for what happened to Rosenthal or even wanted to preserve good will for future business reasons does not mean that Tobin was intending to legally bind his company (as well as Blackstone) to pay Rosenthal $12 million when neither Battery or Blackstone did anything to cause the problem. Tobin expressed this point in an internal email, written before this lawsuit was filed, where he said that he felt bad for Rosenthal but nonetheless continued to believe that the problem was ultimately caused "by [Rosenthal's] own stupidity."

Having found that no genuine issue of material fact exists and that plaintiff cannot establish a claim for breach of contract or promissory estoppel against either defendant as a matter of law, we need not address Blackstone's alternative argument that plaintiff cannot show that Battery acted as Blackstone's agent.

## CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment are granted, and judgment is granted to defendants on all counts.

**ENTER:**

JOHN A. NORDBERG
**Senior United States District Court Judge**

**DATED:** July 10, 2007

-28-